[994 NYS2d 514]

In the Matter of Sanctioning of RICHARD N., a Juror.

Supreme Court, Queens County, August 29, 2014

## APPEARANCES OF COUNSEL

*Richard N.*, respondent pro se.

### OPINION OF THE COURT

MARTIN E. RITHOLTZ, J.

What is the appropriate sanction for an impaneled juror who intentionally abandons a summary jury trial after being charged on the law and before deliberations, and, further, misleads the court as to his whereabouts? Should it matter that an alternate juror replaced him in the interim, and that the trial was only delayed by an hour and a half? Finally, during the hearing to determine the true reason for his absence, is the recalcitrant juror entitled to representation by counsel? These are the issues addressed in this special proceeding.

### The Facts

On July 14, 2014, at 11:30 a.m., the court was assigned a summary jury trial, entitled *Harris v Pinnock* (index No. 5006/12), to determine damages only, with a "High Low" agreement in place, relating to a motor vehicle accident which took place on September 17, 2011. A summary jury trial is a voluntary and expedited form of alternative dispute resolution that combines the flexibility and cost-effectiveness of arbitration with the structure of a conventional jury trial (*see Griffin v Yonkers*, 26 Misc 3d 917 [2009]). Pursuant to summary jury trial rules, a jury including an alternate was impaneled within an hour, and the trial began at 12:30 p.m. Richard N.,[1] the subject of this proceeding, was seated as juror number 6, on his first day of jury service.

In the afternoon, the evidence was completed, both sides rested, summed up, and the court charged the jury on the law. Due to the fiscal constraints of the court system, which mandate that court proceedings cease at 4:30 p.m., there was no time for deliberations, and the jury was directed on the record to report back the next day, July 15, at 9:15 a.m., so as to commence deliberations.

---

1. The name is fictionalized and abbreviated for the anonymity of the juror.

Based on facts adduced at a hearing subsequently conducted as part of this special proceeding, it appears that a court officer found Richard N., after 4:30 p.m., sitting on a bench in the corridor looking dejected. Upon inquiry by the concerned court officer, Richard N. complained that he thought that his jury service "would not take more than a day," and was upset that he was required by the court to return the following morning at 9:15 a.m. for jury deliberations. In his words, since he did not make any accommodations for work the next day as a teacher, he could not continue service on the jury, and instead, had to report to work. At that time, the court officer reminded him that it was the court's order to appear the next day at 9:15 a.m.

The following day, the juror, Richard N., did not return for deliberations. He did not call to explain his absence, and the court made many attempts to reach him by phone, to no avail. The court and all the other jurors waited an hour and a half for this juror to arrive, and, at 10:45 a.m., the parties consented to the replacement of the alternate to fill the seat of the absent juror. The jury returned a verdict at 11:15 a.m.

The court could not countenance this inexcusable absence, and persisted and eventually was able to reach Richard N. by phone at noon. He explained that he had a "neurological emergency" and had to see a doctor. When asked the name and address of the physician, he provided a name that proved, upon the court's investigation, to be fictitious. At that point, the telephone connection was abruptly lost, and the court was presented with what appeared to be an intentional violation of a court order, compounded by a prevarication as to his true whereabouts.

Under these circumstances, the court contemplated a bench warrant to have this recalcitrant juror produced for a possible contempt hearing, to have him purge his apparent contempt, either by bringing in proof of the alleged emergency visit to a neurologist, or by requiring him to continue his jury service as a potential juror in another case, or by simply having him pay a fine for his inexcusable conduct. As to whether he would be subject to civil or criminal contempt was not an issue at that time, but an explanation under oath of the true cause of his absence was the immediate purpose of the proposed special proceeding.

Before issuing a bench warrant, the court left a message on Richard N.'s cell phone, that if he did not return the call within an hour, a bench warrant would be issued, to have him appear

for a contempt hearing, and that he would have the right to counsel. Within a short period of time, Richard N. contacted the court, and confessed that he had lied as to the neurological emergency and that he, in reality, taught his course at a local college that morning, instead of reporting to jury duty. He apologized for his conduct. Whereupon, the court directed him to report immediately for a hearing, at which time he would possibly face a fine for a sum no greater than $250, and that counsel would be unnecessary, unless he deemed otherwise.

At the hearing conducted by the court that afternoon, a record was made of the foregoing facts. Richard N., under oath, explained that he was a college instructor and occasionally suffered from migraine headaches. Although he admittedly went to work that morning, when confronted by the court, he claimed a "neurological emergency" and gave the name of a fictitious doctor, which was really the name of a secretary in his department. When asked by the court if he had any words to say regarding his conduct, he stated: "I am very sorry."

## The Law

### (a) The Importance of Trial by Jury

As an initial matter, the importance of jury service cannot be minimized. It is the linchpin of our democracy, and is, in essence, the backbone of the American system of justice (*see Mitchell v Superior Court*, 43 Cal 3d 107, 132, 729 P2d 212, 228-229 [1987 en banc], *vacated on other grounds and depublished* 49 Cal 3d 1230, 783 P2d 731 [1989]). Thomas Jefferson, writing to Thomas Paine in 1789, stated: "I consider [trial by jury] as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." (Letter from Thomas Jefferson to Thomas Paine, July 11, 1789.) Alexander Hamilton portrayed it as a "valuable safeguard to liberty" and "the very palladium of free government." (Alexander Hamilton et al., The Federalist, No. 83 at 542-543 [Natl. Home Lib. Found. ed 1937], as cited in *Mitchell v Superior Court*, 43 Cal 3d at 135, 729 P2d at 231.) Alexis de Tocqueville noted:

> "The jury . . . invests each citizen with a kind of magistracy; it makes them all feel the duties which they are bound to discharge towards society; and the part which they take in the Government. By obliging men to turn their attention to affairs which are not exclusively their own, it rubs off that individual egotism [private selfishness] which is the rust of society." (1 Alexis de Tocqueville et al., Democracy

in America 334-337 [Schocken 1st ed 1961], as cited in *Powers v Ohio*, 499 US 400, 407 [1991], and *Mitchell v Superior Court.*)

It has been noted that "[e]xcept perhaps for active military duty, there is no other public function that the government delegates to its citizens more important than jury service." (*Matter of Eigner*, 39 Misc 3d 1214[A], 2013 NY Slip Op 50609[U], *3 [Sup Ct, Bronx County 2013].) To a certain extent, a federal judge even equated jury service to military duty, as follows: "Jury service honorably performed is as important in the defense of our country, its Constitution and laws, and the ideals and standards for which they stand, as the service that is rendered by the soldier on the field of battle in time of war." (Hon. George Hugo Boldt, United States District Court for the Western District of Washington, Southern Division, concluding remarks in *United States v Beck*, cause No. 16515, Feb. 1959, *affd in part* 298 F2d 622 [1962], *cert denied* 370 US 919 [1962].) Justice Edward T. McLaughlin analogized "jury service to being drafted into the armed forces during wartime, emphasizing that someone could not be excused for personal convenience" (*Matter of Pringle*, 6 Misc 3d 1025[A], 2005 NY Slip Op 50180[U], *2 [Sup Ct, NY County 2005]).

In sum, jury duty is essentially an honor and a privilege, which "affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for law." (*See Duncan v Louisiana*, 391 US 145, 187 [1968, Harlan, J., dissenting].)

(b) Jury Duty in Civil Trials

The Seventh Amendment of the United States Constitution, dealing with civil trials, guarantees the right to a jury trial and provides, inter alia, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." This inalienable right is reiterated in the Constitution of the State of New York, article 1, § 2, as follows: "Trial by jury in all cases in which it has heretofore been guaranteed by constitutional provision shall remain inviolate forever." Article 41 of the CPLR delineates the procedures governing trial by a jury in civil matters.

Pursuant to section 524 of the Judiciary Law, a person may be called for jury duty six years after his or her last date of service in the Unified Court System, and, if the service lasted for more than 10 days, he or she will not be called for a period of eight years after the last date of service. Section 128.9 of the

Uniform Rules for the Jury System, dealing with frequency of service, provides for the reduction of the disqualification period, under certain circumstances (*see* 22 NYCRR 128.9 [b]). In practice, the frequency of jury service in New York City is as follows: Queens County—every four years; New York County—every six years; Kings County—every eight years; Richmond County—every six years; and Bronx County—if serving two days or less, jurors will be called again in two years; if serving three days or more, jurors will be called in again in four years (as per the information provided by the good offices of Hon. Audrey I. Pheffer, Queens County Clerk).

(c) Sanction for Failure to Appear for Jury Duty

Any person who fails to respond to a juror qualification questionnaire or fails to appear for jury duty after having been summoned shall be subject to a civil penalty not to exceed $250 (*see* Judiciary Law § 527). The commissioner of jurors may institute a noncompliance proceeding against delinquent prospective jurors, which procedure is set forth in section 128.12 of the Uniform Rules for the Jury System (22 NYCRR). Should a respondent request a hearing, the court or a judicial hearing officer shall conduct such a hearing, and the respondent may be represented by counsel. All penalties imposed shall be payable to the appropriate commissioner of jurors, who shall transmit such payments to the county clerk for transmittal to the state commissioner of taxation and finance (*see* 22 NYCRR 128.12 [e]).

(d) The Appropriate Sanction for a Recalcitrant Juror

1. Criminal Contempt

Pursuant to Judiciary Law § 750 (A) (3), a court has the power to punish, for criminal contempt, a person who willfully disobeys its lawful mandate. Punishment for criminal contempt may be by fine, not exceeding $1,000, or by imprisonment, not exceeding 30 days (Judiciary Law § 751 [1]).

The court may summarily punish a contempt committed in its "immediate view and presence" (*see* Judiciary Law §§ 750 [A] [1]; 751 [1]; 755). A warrant may be issued directing the sheriff to arrest an accused contemnor and bring him in before the court to answer for the alleged offense (Judiciary Law § 756).

It has been held that a criminal contempt "involves an offense against judicial authority and is utilized to protect the integrity of the judicial process and to compel respect for its

mandates" (*Matter of Department of Envtl. Protection of City of N.Y. v Department of Envtl. Conservation of State of N.Y.*, 70 NY2d 233, 239 [1987]; *Town Bd. of Town of Southampton v R.K.B. Realty, LLC*, 91 AD3d 628, 630 [2012]). The aim in a criminal contempt proceeding is, unlike a civil contempt proceeding, "solely to punish the contemnor for disobeying a court order" (*Matter of Department. of Envtl. Protection* at 240), and "the penalty imposed, is punitive rather than compensatory" (*Town Bd. of Southampton* at 630; *see State of New York v Unique Ideas*, 44 NY2d 345, 349 [1978]).

Instances in which jurors, including prospective jurors, were held in criminal contempt are exemplified by the following: *Matter of Caruso v Wetzel* (33 AD3d 161 [1st Dept 2006] [contemptuous conduct by prospective juror during voir dire, fined $1,000]); *Matter of Pringle* (6 Misc 3d 1025[A], 2005 NY Slip Op 50180[U] [Sup Ct, NY County 2005] [prospective juror absented himself during voir dire, sentenced to four days in jail]); *State v Kennerly* (337 SC 617, 524 SE2d 837 [1999] [juror disregarded judge's direction not to discuss merits of case prematurely, sentenced to six months' imprisonment]); *Hopkins v United States* (595 A2d 995 [DC Ct App 1991] [three jurors held in criminal contempt during course of trial for returning from a break 15 minutes late, fined $25 each]); and *In re Jaye* (90 FRD 351 [ED Wis 1981] [prospective juror refused to take a seat in the jury box after being ordered by judge, sentenced to 48 hours of custody]).

## 2. Civil Contempt

Pursuant to Judiciary Law § 753 (A), the statutory source of judicial authority to punish for civil contempts, the court has the power "to punish, by fine and imprisonment, or either, a neglect or violation of duty, or other misconduct, by which a right or remedy of a party to a civil action or special proceeding, pending in the court may be defeated, impaired, impeded, or prejudiced." This includes "any other disobedience to a lawful mandate of the court" (Judiciary Law § 753 [A] [3]).

A special subsection specifically deals with various forms of juror civil contempt, to wit, improperly conversing with a party to an action, or with any other person, in relation to the merits of that action; or receiving a communication from any person, in relation to the merits of such action, without immediately disclosing same to the court; or a person who attends and acts as a juror in place and stead of a person who has been duly notified to attend (Judiciary Law § 753 [A] [6]).

Judiciary Law § 773 provides for two kinds of fines to be imposed for civil contempt: one fine covering the actual damage resulting from the contemptuous acts, and one where no actual loss or injury has been caused, and, in that circumstance, the fine imposed must not exceed the amount of the complainant's costs and expenses, and $250 in addition thereto (*see State of New York v Congress of Racial Equality [C.O.R.E.]*, 92 AD2d 815, 817 [1983]). Length of imprisonment for civil contempt is set forth in Judiciary Law § 774.

To be distinguished from criminal contempt, a civil contempt generally "seeks vindication for individuals who have been injured or 'harmed by [a] contemnor's failure to obey a court order' " (*Matter of Department of Hous. Preserv. & Dev. of City of N.Y. v Deka Realty Corp.*, 208 AD2d 37, 42 [2d Dept 1995], citing *Matter of Department of Envtl. Protection of City of N.Y. v Department of Envtl. Conservation of State of N.Y.*, 70 NY2d 233, 239 [1995]; *Town Bd. of Town of Southampton v R.K.B. Realty*, 91 AD3d at 630). In essence, civil contempt fines must be "remedial in nature and effect" (*State of New York v Unique Ideas*, 44 NY2d 345, 349 [1978], citing *Gompers v Bucks Stove & Range Co.*, 221 US 418 [1911]). It has been further held that "[a]ny penalty imposed is designed not to punish but, rather, to compensate the injured private party or to coerce compliance with the court's mandate or both" (*Matter of Department of Envtl. v Department of Envtl.*, 70 NY2d at 239). There are instances where civil contempt sanctions have been deemed coercive, and can be seen as both remedial and punitive, when they serve "to vindicat[e] its legal authority to enter the initial court order," as well as "modifying the contemnor's behavior to conform to the terms required in the order" (*Hicks v Feiock*, 485 US 624, 635 [1988]).

Examples of jurors who were held in civil contempt include: *In re Freed* (960 F Supp 2d 716 [WD Mich 2013] [impaneled alternate juror refused to serve on jury, was imprisoned until jury for which he had been selected had been discharged, or until he purged himself of his contempt]); and *Matter of Werra* (123 Misc 788 [Sup Ct, Richmond County 1924] [duly selected juror sought an interview with the plaintiff and improperly demanded a sum of money to influence his vote, sentenced to 30 days in county jail, and fined the sum of $354], *affd* 208 App Div 856 [2d Dept 1924]).

### 3. The Court's Inherent Judicial Authority to Sanction a Recalcitrant Juror

■ It is well settled that, while the judiciary derives much of its authority from the legislature, courts "are vested with inherent powers, which are neither derived from nor dependent upon express statutory authority" (*Gabrelian v Gabrelian*, 108 AD2d 445, 448 [1985]). Such inherent powers are exercised when it is "reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its lawful actions effective." (*Id.*)

This inherent judicial power was reaffirmed by the Court of Appeals, as follows: "There are some matters which are not subject to legislative control because they deal with the inherent nature of the judicial function" (*Matter of A.G. Ship Maintenance Corp. v Lezak*, 69 NY2d 1, 5 [1986]; *see Ocasio v Jacobson*, 1996 WL 66112, 1996 US Dist LEXIS 1602 [SD NY, Feb. 15, 1996, No. 95-Civ-10775 (SHS)]).

This year, the Court of Appeals restated this authority:

> "a court has inherent power to address actions which are meant to undermine the truth-seeking function of the judicial system and place in question the integrity of the courts and our system of justice. 'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and, as a corollary to this proposition, to preserve themselves and their officers from the approach and insults of pollution' (*Anderson v Dunn*, 19 US 204, 227 [1821])." (*CDR Créances S.A.S. v Cohen*, 23 NY3d 307 [2014].)

In fact, similar to this case, Justice McLaughlin, in New York County, when confronted with an impaneled juror who abandoned the trial in the midst of the proceeding, rejected the statutory remedies of civil or criminal contempt. The court opted, instead, to invoke its inherent power, in an effort to provide a less severe remedy than a contempt finding, and imposed the fine of $100 (*Matter of Diane D.*, 161 Misc 2d 861 [1994]).

### (e) Is There a Right to Counsel at a Recalcitrant Juror Sanction Hearing?

One who may be deprived of life or liberty in a court proceeding should be afforded a reasonable opportunity to obtain counsel to represent him, in accordance with the due process provisions of the Fifth and Fourteenth Amendments to the United States Constitution (*see* Marjorie A. Caner, Annotation,

*Right to Appointment of Counsel in Contempt Proceedings*, 32 ALR5th 31). The Court of Appeals succinctly set forth the right to counsel in New York, as follows:

> "The underlying principle is that when the State or Government proceeds against the individual with risk of loss of liberty or grievous forfeiture, the right to counsel and due process of law carries with it the provision of counsel if the individual charged is unable to provide it for himself" (*Matter of Smiley*, 36 NY2d 433, 437 [1975]).

That same decision also held that "[n]o similar constitutional or statutory provision applies to private litigation." (*Id.* at 438; *see Wills v City of Troy*, 258 AD2d 849 [1999], *lv dismissed* 93 NY2d 1000 [1999]; *Matter of Miller v Gordon*, 58 AD2d 1027 [1977].)

The U.S. Supreme Court addressed the question, posed herein, as to "what procedural protections are due before any particular contempt penalty may be imposed." (*Mine Workers v Bagwell*, 512 US 821, 831 [1994].) The following is the answer provided:

> "Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required. To the extent that such contempts take on a punitive character, however, and are not justified by other considerations central to the contempt power, criminal procedural protections may be in order" (*id.*).

In a more recent U.S. Supreme Court decision, it was held that the Due Process Clause does not automatically require the provision of counsel at civil contempt proceedings to an indigent individual who is subject to a child support order, even if that individual faces incarceration for up to a year (*Turner v Rogers*, 564 US —, 131 S Ct 2507 [2011]). The Court elaborated: "in determining whether the Clause requires a right to counsel . . . , we must take account of opposing interests, as well as consider the probable value of 'additional or substitute procedural safeguards' " (*Turner v Rogers*, 564 US at —, 131 S Ct at 2518, citing *Mathews v Eldridge*, 424 US 319, 335 [1976]).

Nevertheless the Appellate Division, First Department, categorically invoked the right to counsel, when an ex-husband failed to comply with an interim order, directing him, inter alia, to pay for the children's tuition, as follows: "A respondent in a civil contempt proceeding facing the possibility of the imposi-

tion of a term of incarceration, however short, is entitled to the assignment of counsel upon a finding of indigence." (*Ullah v Entezari-Ullah*, 40 AD3d 201, 206 [2007]; *also see Matter of Madison County Support Collection Unit v Feketa*, 112 AD3d 1091 [2013].)

On the other hand, the U.S. District Court ruled that a plaintiff held in civil contempt for violating orders, requiring her to return all juror questionnaires, and to refrain from attempting to communicate with members of the jury, was properly denied appointment of counsel, where she had "demonstrated her ability to represent herself and because the issues" involved in the contempt proceeding, "were not so complex as to suggest that denial of counsel would be likely to result in fundamental unfairness" (*Nabkey v Hoffius*, 827 F Supp 450, 453 [WD Mich 1993]; *also see Sheedy v Merrimack County Superior Ct.*, 128 NH 51, 509 A2d 144 [1986]; *Duval v Duval*, 114 NH 422, 322 A2d 1 [1974]).

In New York, there is no right to counsel in summary contempt proceedings (*see Matter of Katz v Murtagh*, 28 NY2d 234 [1971]). Pursuant to Judiciary Law § 770, upon the return of an application to punish for contempt, "the court shall inform the offender that he or she has the right to the assistance of counsel, and when it appears that the offender is financially unable to obtain counsel, the court may in its discretion assign counsel to represent him or her." In other words, while statutory law guarantees counsel in all contempt proceedings, other than summary contempt, to a litigant in Family Court, there is only a discretionary right to counsel in civil contempt proceedings in other courts, where incarceration is not an option (*cf.* Family Ct Act § 262 [a] [vi]; *see* Laura K. Abel, *Toward a Right to Counsel in Civil Cases in New York State: A Report of the New York State Bar Association*, 25 Touro L Rev 31, 69 [2009]; *also see* Jacob R. Fiddelman, *Protecting the Liberty of Indigent Civil Contemnors in the Absence of a Right to Appointed Counsel*, 46 Colum J L & Soc Probs 431 [2013]).

■ In sum, based on the above, the right to counsel at a recalcitrant juror sanction hearing is to be determined on a case-by-case basis, depending on such factors as: whether there is a statutory right to counsel; whether the alleged offender faces incarceration; whether he or she is capable of speaking for himself/herself; whether the issues involved are complex; and/or whether the denial of counsel would result in fundamental unfairness.

## Conclusion

At the commencement of the instant sanction hearing, the court recognized that it had the authority to deal with Richard N.'s misconduct by either proceeding with a civil or criminal contempt remedy. However, under the circumstances of this case, the court is of the opinion that sanctioning Richard N. under the court's inherent powers adequately accomplishes the purpose of serving warning to similar-minded persons who are selected as jurors, that absconding during trial, and then deceiving the court, is not only irresponsible behavior, but carries repercussions. In the present case, what causes the court grave concern is that the behavior engaged in was by a college lecturer—a professional who is entrusted with a special duty to be an example to the students he or she teaches. Taking into consideration, as noted above, that many jurists have equated jury duty with military service, then, in the opinion of this court, juror Richard N. discharged those responsibilities dishonorably.

To Richard N.'s credit, when called by the court for a hearing to explain his behavior, he reported immediately, and apologized profusely to the court for his absence and efforts to deceive. Ironically, he had delayed the jury deliberations by an hour and a half, which when commenced, lasted only a half hour; yet, because of his absence, he had to wait close to three hours until the instant proceeding was called, so that the court could conclude another ongoing trial. At his hearing, Richard N. admitted his wrongdoing and was contrite. Since, at the outset, Richard N. was told that he would possibly face a sum for no greater than $250, and that this was not meant to be a contempt proceeding, but rather a sanction hearing pursuant to the court's inherent powers, it was determined that there was no need for representation of counsel, and no such right was requested.

Upon consideration of all the circumstances herein, the court believes that the imposition of a fine of $250 upon Richard N. is adequate punishment. Furthermore, the court finds that Richard N. was delinquent and did not fulfill his jury service obligations, and thus, he should not be credited for any of his present service. Wherefore, his name will remain in the general pool, and he may be called again for jury service in the near future (*cf.* Judiciary Law § 524).

Accordingly, on the record, at the end of the hearing, the court ordered Richard N. to pay the sum of $250, by cash or

money order, to the County Clerk, Queens County, within 30 days of the date of the hearing. Once paid, the sum should be transmitted to the State Commissioner of Taxation and Finance. (*Cf.* 22 NYCRR 130-1.3; *Matter of Diane D.*, 161 Misc 2d at 865.) Should the fine not be paid as directed, the court shall take such measures as required under its powers to adjudicate a criminal contempt.[2]

Finally, the Commissioner of Jurors is directed to immediately restore Richard N.'s name to the general list of qualified jurors, and he shall not be credited for any service rendered at the present time (*cf.* 22 NYCRR 128.9).

---

2. Within two weeks after the hearing, the fine was paid.